IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 6, 2004 Session

## STATE OF TENNESSEE v. JAMES G. HUPPE, JR.

**Direct Appeal from the Circuit Court for Warren County**
**No. F-8275     James L. Weatherford, Senior Judge, Sitting by Designation**

-------

**No. M2003-00618-CCA-R3-CD - Filed July 13, 2004**

-------

The defendant, James G. Huppe, Jr., was convicted of burglary and theft over $1000, Class D felonies, and was sentenced to concurrent terms of three years, suspended except for fifty-three days, with the balance to be served on probation. Additionally, he was ordered to pay restitution in the amount of $4278 and was fined a total of $10,000. On appeal, he argues that he was denied his right to a speedy trial, the court erred in restricting his cross-examination of the victim, and the evidence is insufficient to sustain the convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

John Wayne Allen, Cookeville, Tennessee, for the appellant, James G. Huppe, Jr.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Clement Dale Potter, District Attorney General; and Larry G. Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**TRIAL TESTIMONY**

The State's first witness, Detective Nichole Hutchins of the McMinnville Police Department, testified she investigated a burglary on February 25, 2000, at Bill's Glass and Body Shop in McMinnville. She went to the business and observed a hole at the bottom of the door to the "paint room," apparently making it possible to reach inside and unlatch the door. As to this means of entry,

she said that "you would have to have somebody that had been in the building before to know how to make entry in that way."[1]

Phillip Sandlin testified that he was self-employed, rebuilding alternators and starters, and his business was "[r]ight next to Bill's Auto Body." He said that on the evening of February 24, 2000, he saw the defendant pull his vehicle onto his driveway, which was on the opposite side of the building from Bill's, and the defendant, who was accompanied by Larry Tittsworth, asked "about some Ford parts on a truck." After Sandlin replied that he had such parts, the defendant and Tittsworth "went out back." Asked by the defendant at 7:20 p.m. how much longer he would be there, Sandlin replied, "I'll probably be here a couple hours." On cross-examination, Sandlin said that he remembered this conversation with the defendant had occurred in 2000, but did not "honestly" recall that it had been on February 24. On redirect examination, he said that, the morning after this conversation with the defendant, he "c[a]me into work and there was [sic] officers over there next door."

Billy Slatton testified that he owned a body shop in McMinnville and, on February 25, 2000, had reported a burglary. He had locked the building when he left the evening before and returned to his business at approximately 8:00 a.m. on February 25. An hour or so later, as he was looking for a heat gun, he discovered that several items were missing and called the police. He said the items taken included a heat gun, welder, digital paint scales, three paint guns, sandpaper, bondo, thinner, paint cleaners and solvents, a windshield cutting kit, an air urethane gun, an air impact wrench gun, air ratchets, air chisels and bits, and other items. Slatton estimated the value of the stolen items to be approximately $7500. He explained why he believed his business had been entered through the paint room:

> Well, to start with I seen [sic] some pieces of wood laying on the concrete floor there and after I got to checking it the latch is back but they's [sic] two bars and one of the bars was laying on the floor that didn't get back in there right. It was tried to be fixed where it wasn't entered that way.

Slatton said that two or three months after the burglary, he went to Ricky Johnson's Motors, as the result of a telephone call, where he found some of the items taken from his business, including the welder, bondo filler, socket wrenches, sandpaper, hand cleaner that could not be purchased locally, and about 150 shop towels "still bundled up." He said he identified the welder as his because his business card was taped on it. After he had identified these items, he notified the sheriff's department.

On cross-examination, Slatton said that his business had been broken into in August 1999, and, apparently, described that incident to a police officer as occurring when the defendant had come

---

[1] To recount the testimony of witnesses, we are utilizing the copy of the trial transcript contained in the "Certificate of Counsel."

and gotten his tools. He said that the defendant owed money to him and offered to give him tools to satisfy the debt, proposing that Slatton select the tools. Slatton said he "knew" the defendant was a suspect in the February 2000 burglary and, apparently, testified[2] that he drove to the defendant's house on the evenings of February 26 and 27. On redirect examination, Slatton said that on February 28, 2000, he recovered the ICI scales and an air urethane gun, which had been stolen from his business during the February 24 burglary, from the defendant's residence.

Ricky Johnson, Jr., testified that this his occupation was to "[t]ake parts off cars and just work in a junkyard." He said that he was a friend of both the defendant and Larry Tittsworth. In February 2000, he had seen the defendant at Tittsworth's house where they had been working on Johnson's four-wheel drive vehicle. He said that the defendant had arrived in an Isuzu pickup truck, which he and Tittsworth left in and then returned, with the truck bed "full of stuff." He said they later brought a welder to his junkyard and asked him to hold it for them because they were going on vacation and Tittsworth's shed did not have doors. Johnson said they left the welder at his place, along "with some shop towels and some air craft remover and stuff like that." Later, the defendant and Tittsworth returned to Johnson's to pick up the welder but then told him, "[I]t ain't a good time right now . . . too many cops around." Apparently referring to the welder, Johnson said that the defendant told him "it came from Bill's shop." On cross-examination, Johnson said the welder had been brought to his house "right before" a story about it apparently had been published in a newspaper.

Ricky Johnson, Sr., testified that he had called Slatton in May 2000, about a welder at his son's trailer which, apparently, was near his salvage yard. He saw a welder which he recognized as belonging to Slatton and called him about it. Slatton came to the salvage yard and later called the sheriff's department. On cross-examination, Johnson said his son told him that Tittsworth had brought the welder to that location. He said that he did not recall the day or year when all of this had occurred. He said he remembered that the day the victim came to reclaim the items from him was the same day that a "guy outrun the cops and stopped for a funeral" on Leesburg Road and tried to escape from the police again after the procession had passed.

Deputy Kevin Murphy of the Warren County Sheriff's Department testified that he responded on May 22, 2000, to a call at Ricky Johnson's salvage yard. He spoke with Bill Slatton and returned certain items to him.

The first defense witness was Joyce Carter, a records clerk at the Warren County Sheriff's Department. She said that she had no records of automobile accidents reported to have occurred in 2000 on Leesburg Road or of a patrol car leaving a funeral procession to chase another vehicle.

Carol Holiday testified that she was the defendant's girlfriend. She said that, on February 24, 2000, after they had returned to their residence from work, the defendant went to Larry Tittsworth's with some items he had gotten from Dayco, where Holiday and the defendant both

---

[2]As to some matters, the victim's testimony is not entirely clear.

worked, and returned between 8:00 and 8:30 p.m. She testified that she specifically remembered that day because it was the day she had been given notice by Dayco that she was to be laid off. She said that they went to bed that night at 9:00 p.m. and had to get up the following morning at 4:30 a.m. in order to be at work by 6:00 a.m. She said that the defendant was arrested the following Monday and she posted his bond. The following Friday, she called the police because tools were missing from their garage.

The defendant testified that Larry Tittsworth came to his residence on February 23, 2000, to help load various items, some of which were to be discarded. On February 24, he went to Tittsworth's after work, and together they went in the defendant's truck to Phillip Sandlin's business and told him they were going to look in the rear of the business for the hood hinges for the defendant's truck. According to the defendant, the hinges had been at this location for a period of time. After seeing that they would have to search "a big pile of scrap metal" for the hinges, they decided instead to return to Tittsworth's residence, and the defendant then went to his own residence. He said that on February 28, 2000, he discovered that "a bunch of stuff" was missing from his garage. The police were called and came to his house to investigate and, apparently, arrested him. He denied breaking into the victim's shop.

Before our review of the issues raised in this matter, we first wish to discuss the difficulties we have had because of deficiencies in the defendant's brief and the appellate record. Tennessee Rule of Appellate Procedure 27(a)(6) provides that the appellant's brief "shall" contain "[a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record." The statement of facts in the defendant's brief includes no discussion of trial evidence and few references to the record, consisting almost entirely of his argument that the trial court erred in an evidentiary ruling limiting his cross-examination of a State's witness. Since one of his claims was that the evidence presented by the State is insufficient to support his conviction for burglary, it would have been helpful in our consideration for the defendant to have reviewed the evidence, and this rule required, in fact, that he do so.

Additionally, the defendant did not comply with Tennessee Rule of Appellate Procedure 24(b) and (f) regarding the filing of transcripts of the trial and of various hearings. Specifically, Rule 24(f) provides that "[t]he trial judge shall approve the transcript or statement of the evidence and shall authenticate the exhibits as soon as practicable after the filing thereof. . . ." For the most part, as we will explain, the transcripts upon which the defendant relies are in the record only as attachments to pleadings and without having been approved by the trial court. We will review the manner in which the trial transcript and most of the hearing transcripts came into the appellate record.

The defendant's notice of appeal was filed on March 5, 2003; and, on November 12, 2003, he filed with the clerk of this court his "Motion to Supplement Record" with, by his description, "a document, entitled, Certificate of Counsel, a voluminous transcript, which includes the remainder of the pretrial records[,] [t]he trial transcript, and other pleadings and documents." Although the clerk of this court did file this 444-page volume on November 21, 2003, this court, in fact, had

entered an order that same day directing that the pleading not be filed.  Thus, as now within the record on appeal, the "Certificate of Counsel" consists of a spiral-bound, 444-page volume, prepared by the defendant, and certified as "a true, accurate and complete account of all proceedings conducted and evidence received in this cause."  Much of our problem in considering this appeal resulted additionally from the duplications in the "Certificate of Counsel," which contains what appears to be the first sixty-one pages of the transcript of the defendant's June 27, 2000, preliminary hearing; two copies of the transcript of a June 14, 2002, hearing in the Warren County Circuit Court; three copies of the transcript of a June 17, 2002, hearing in the Warren County Circuit Court; a transcript of the defendant's October 10, 2002, trial, bearing the court reporter's original signature and seal; a copy of the transcript of the defendant's December 2, 2002, sentencing hearing; and a copy of the transcript of the February 14, 2003, hearing on the defendant's motion for a new trial.  Since it does not appear that any of these transcripts were submitted to the trial court, as required by Rule 24(f), this document, and all of its contents, is not properly in the appellate record.

Since the State responded on the merits, rather than arguing that the defendant failed to comply with the Rules of Appellate Procedure or Criminal Procedure in his appeal, we will consider the documents contained in his "Certificate of Counsel," to the extent that the record permits us to do so.  Had the State argued that the various hearing and trial transcripts contained in the "Certificate of Counsel" were not properly before this court, we would have agreed and stricken it from the appellate record.  Having made these observations, we now will consider the defendant's appeal.

## ANALYSIS

### I. Denial of Right to Speedy Trial

The defendant argues on appeal that the State violated his right to a speedy trial of the charges against him.  Relying on the period between his being charged with these offenses and his trial, the defendant asserts that he was prejudiced by the delay; the State presented "no valid reason for the delay;" he demanded a speedy trial; and he suffered anxiety and expense as the result of the delay.

Following hearings, the trial court denied the defendant's claim that he had been denied his right to a speedy trial:

> The Court finds from the proof presented sometime ago, and the statements [o]f the attorneys, including a very fine brief submitted by [defense counsel], that the motion for a speedy trial is without merit. There has been no formal request made.  You are suggesting there was one in DeKalb County.  The Court finds that the defendant was absent for sometime from this jurisdiction.  There has been no prejudice I find to the defendant.  He says he was undergoing stress and so forth, and that is certainly understandable.  That, however, would not warrant a dismissal of the case.

The defendant's argument on appeal as to his speedy trial claim consists of assertions supported by scant references to the record. In fact, his specific allegations as to the chronology of events, the dates of his arrest, indictment and trial are not supported by any references to the record. For instance, his claim that "[t]he State has never explained its neglect in not serving the indictment" refers, as authority, to a portion of the transcript of a hearing on June 17, 2002, where he made this same argument. In other words, to support this argument on appeal, he relies upon his making this same argument before the trial court. His claims, that "when the Court tried to set a trial date on June 17, 2002, the State, who should have recognized the necessity of having this case heard as soon as possible[,] did not stand ready to set a trial date" and that "[u]ltimately, the State received a trial date of its choosing," are made without any references to the record. Accordingly, as to this issue, the defendant failed to comply with Tennessee Rule of Appellate Procedure 27(a)(7), requiring "appropriate references to the record" and Court of Criminal Appeals Rule 10(b), providing that "[i]ssues which are not supported by . . . appropriate references to the record will be treated as waived in this court." The State having responded on the merits, however, we will consider the defendant's claims to the extent that the record permits us to do so.

In State v. Bishop, 493 S.W.2d 81, 83-84 (Tenn. 1973), our supreme court, adopting the balancing test of Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), explained factors to consider in assessing the validity of a claim that a defendant had been denied his right to a speedy trial:

> In Barker v. Wingo, supra, the court accepted a "balancing test" in which the conduct of both the prosecution and defendant are weighed, which test of necessity compels the court to approach speedy trial cases on an ad hoc basis. In the Barker case the court discussed four specific factors: (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted a claim to his right, and (4) whether defendant was prejudiced by the delay.

On appellate review, the trial court's determination in this regard is subject to review for abuse of discretion. See State v. Jefferson, 938 S.W.2d 1, 9 (Tenn. Crim. App. 1996).

We now will apply these principles in reviewing the defendant's claims that he was denied his right to a speedy trial.

## A. Length of Delay

In Doggett v. United States, 505 U.S. 647, 652, 112 S. Ct. 2686, 2691, 120 L. Ed. 2d 520 (1992), the Court stated, "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time." Our supreme court concluded a delay of thirteen years, as occurred in State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996), was a factor weighing "favorably for the defendant" and clearly required an analysis of the remaining factors. In this matter, the defendant was indicted on July 14, 2000, and his trial began on October 10, 2002. In view of the length of the delay between his

indictment and trial, we conclude that the delay weighs in favor of the defendant and requires additional analysis.

## B. Reason for the Delay

The defendant presents a number of claims on appeal as to the reason for the delay. He asserts that "[t]he [S]tate waited eleven months to serve [the defendant] with an indictment, and over two years passed before [he] had his day in Court." While we agree that over two years passed between the defendant's being charged and his trial, the defendant makes no reference to the record to show when he was arraigned on the charges. As to the claim that "his trial was set for March 14, 2002," he cites, as authority, the argument of his counsel to the trial court at a June 14, 2002,[3] hearing, making this very same claim. Next, he asserts as to the March 14, 2002, trial date, again with no citation to the record, that "[t]he State, without motioning the court, unilaterally cancelled this trial date." As for the State's motive in doing so, he argues, without reference to the record, that "the [S]tate removed the case from the docket in order to gain an unfair tactical advantage in the trial and exacted a statement from alleged co-defendant, James Larry Tittsworth[,] on April 9, 2002." Without reference to the record, he claims that "on the date set for trial in March 2002, the State did not have Tittsworth['s] cooperation and were [sic] not confident at that time of a conviction." He asserts, without reference to the record, that "the State did not motion the Court and only notified defense counsel a few days before trial after defense counsel had incurred hours in preparation." Without reference to the record, he asserts that "[e]ven when the Court tried to set a trial date on June 17, 2002, the State, who should have recognized the necessity of having this case heard as soon as possible[,] did not stand ready to set a trial date." Thus, the defendant's claims as to the reason for the delay consist of argument without a supporting factual basis.

This court explained in State v. Burton, 751 S.W.2d 440, 450 (Tenn. Crim. App. 1988), that counsel's assertions and arguments may not be substituted for facts:

> Statements made by counsel during the course of a hearing or trial are not evidence of the facts recited by counsel. Trotter v. State, 508 S.W.2d 808, 809 (Tenn. Crim. App. 1974); Davis v. State, 673 S.W.2d 171, 173 (Tenn. Crim. App. 1984). The same is true with regard to the recitation of facts and the arguments contained in a brief or similar pleading. Price v. Mercury Supply Co., Inc., 682 S.W.2d 924, 929 n.5 (Tenn. App. 1984).

---

[3] As we have previously stated, the "Certificate of Counsel" contains transcripts of pretrial hearings, two of which bear the cover page of a June 14, 2002, hearing and three of which bear the cover page of a June 17, 2002, hearing. However, one of the transcripts which purports to be of a June 14 hearing is identical to one of the transcripts of what purports to be of a June 17 hearing, and the other transcript of the June 14 hearing is identical to the remaining two copies of the transcript of the June 17 hearing. We presume that cover pages were transposed in assembling the "Certificate of Counsel." Accordingly, for purposes of this review, we have utilized a transcript of the June 14, 2002, hearing which was transmitted by the Warren County Circuit Court Clerk is properly in the record on appeal.

We note that among the trial court's findings following the hearing on the denial of the speedy trial claim was "that the defendant was absent for sometime [sic] from this jurisdiction." Because the defendant does not address that finding in his brief, or supply other than conclusory allegations as to the reason for the delay, we cannot conclude that this consideration may be weighed against the State.

### C. Whether Defendant Asserted His Right to a Speedy Trial

The defendant argues on appeal that "[t]he third prong of the balancing test, [the defendant's] assertion of his right to a speedy trial, was initially satisfied by his motion demanding a speedy trial in October 2001." There are two main problems with this claim. First, as to the location of this motion in the record, the defendant cites us only to "Exhibit 4." We note that the "Certificate of Counsel" contains a copy of a pleading styled "Motion for Speedy Trial," which apparently was filed on October 2, 2000, in the DeKalb County Circuit Court, in the case of State of Tennessee v. James Huppe. Likewise, the technical record contains, *inter alia*, a pleading styled "Defendant's Exhibit List," and Exhibit 4 to that pleading is the same motion for speedy trial filed in the DeKalb County Circuit Court. Presumably, this exhibit list, with attachments, was prepared by the defendant prior to the trial which is the basis for the present appeal. Tennessee Rule of Appellate Procedure 24(a) provides, *inter alia*, that "all papers relating to discovery" and "trial briefs" are "excluded from the [appellate] record." Likewise, Rule 24(f) provides, in pertinent part, that "[t]he trial judge shall approve the transcript or statement of the evidence and shall authenticate the exhibits as soon as practicable." Thus, the speedy trial motion on which the defendant relies is in the record only because it both is attached to a defense trial pleading in the technical record and is contained in the "Certificate of Counsel." As such, its insertion into the appellate record does not comply with Tennessee Rule of Appellate Procedure 24(a) and (f), and this court will not consider it on appeal. Even if it were properly in the record, we note that the defendant's argument on appeal fails to explain why a speedy trial motion filed in the DeKalb County Circuit Court is relevant to a proceeding in the Warren County Circuit Court.

We note that the technical record includes copies of speedy trial motions filed by the defendant in Warren County on April 2, 2002, and June 12, 2002. The trial of this matter began on October 10, 2002, six months after he had filed the first speedy trial motion in Warren County. We further note that the court order resetting the trial from March 14, 2002, to April 9, 2002, states that the resetting was "by the agreement of the parties." Considering all of this, we conclude that this factor, even if against the State, is of slight weight.

### D. Whether the Defendant Was Prejudiced by the Delay

Our supreme court noted in Wood, 924 S.W.2d at 348, that the fourth factor, prejudice to the defendant, is entitled to the greatest weight. As to this consideration, the defendant argues the delay caused him "expenses and mental anguish," and that "[b]ecause of the passing of time, the State's witnesses' memories have diminished, and their stories have changed over time," meaning that "the effectiveness of cross-examination of the accuser as to details [was] diminished." We note first the

-8-

novelty of this argument, for it normally would appear that, in fact, the defense would benefit in its cross-examination of prosecution witnesses when their memories were impaired because of the passage of time. Although the defendant made no citations to the record in support of these claims, the State, in its response, referred to various portions of the record showing that the defendant was not prejudiced by the delay. While the defendant argues that the Johnsons could not recall, at the trial, when the welder had been on the property of the younger Johnson, Johnson, Sr. testified that he immediately called the victim, who then called law enforcement officials. Deputy Murphy then testified as to the day the stolen items were found. Accordingly, we concur with the trial court that the defendant has failed to show that he was prejudiced by the delay between his being indicted and the trial of this matter, and conclude that the trial court did not abuse its discretion in denying the defendant's speedy trial claim.

## II. Limited Cross-Examination of Victim

The defendant argues on appeal that the trial court erred in not allowing the victim to be cross-examined about his negotiating a check payable to the defendant, which had been sent by an insurance company to the defendant at the victim's body shop, apparently because the defendant had been employed there. This matter first arose at trial when, as a preliminary matter, the court considered whether the defendant would be allowed to tell the jury of the matter during his opening statement and then cross-examine the victim about the check.

In reviewing this issue, we note first that the victim had fired the defendant in August 1999, and, at some point later, claimed that the defendant had burglarized his business around the time of his firing. Additionally, in 2000, the victim had brought burglary charges against the defendant in both DeKalb and Warren Counties, the latter of which resulted in the present appeal. On the day of the trial, the parties argued about this matter and, particularly, whether the victim's deposition testimony was referring to the earlier August burglary or the February burglary, for which the defendant then was being tried:

> THE COURT: What was this check for? Why did the insurance company send this check to [the defendant]?
>
> [DEFENSE COUNSEL]: [The defendant's] father died in December of '98, I believe and the insurance company issued a check on his life insurance. Now there is no question whatsoever that [the defendant] owed Mr. Slatton some money. This did not give Mr. Slatton that right to go and take this check and deposit it in his account as payment for this. I suspect [the defendant's] always followed the legal process while Mr. Slatton has not. Like I say, in his deposition testimony he states and if I may be permitted to read it, question from Mr. Slatton's attorney. "So you didn't file charges until after you received a letter from my office in February of 2000; isn't that correct? A. Yes. Q. What prompted you to file those charges? A.

I think I answered that question earlier that I thought he was up to something about that check deal by him getting a hold of a law firm to get me on it and I went ahead and I thought I would file charges on him for what he's done to me."

[PROSECUTOR]: Judge, first of all, I think he's talking about the August burglary that was done prior to the February burglary. So I believe what they're discussing in that deposition is the August burglary which we're not here on today.

[DEFENSE COUNSEL]: Your Honor, Mr. Slatton – one reason we called Officer Marty Cantrell to testify here today is to testify that Mr. Slatton told him that no, [the defendant] came back to his shop right after he fired him in August of '99 and he got only his tools, [the defendant's] tools, nothing belonging to this man. These are intertwined. Mr. Slatton alleges things were taken in August. He alleges things were taken in February. It's very confusing but we have a lot of deposition testimony, a lot of documentary evidence to back up every point that we're going to make in here today.

Making a preliminary ruling on the defendant's argument, the court instructed that the parties should not "mention" the matter of the check in their opening statements.

As the victim later was testifying during the trial, defense counsel, apparently reading from the victim's deposition, asked if he had been questioned at the deposition about filing charges against the defendant and then had responded, "I thought he was up to something about that check deal by him getting a hold of a law firm to get me on it and I thought I would go ahead and file charges against him on what he's done to me." To this question about his deposition testimony, the victim answered at the jury-out hearing: "Well, that's what is right in here. That might have been the way I said it but it's probably meant different from that. I don't know if it makes any difference. The reason I filed charges against him wasn't because of that check. It was because of a break-in."

With the victim apparently still present, the parties continued to argue at length about this matter, the trial court questioning why the matter of the check was relevant if the victim had been referring to the August 1999 burglary when he spoke of "these charges":

THE COURT: Well, . . . if what Mr. Slatton is referring to in that part of the deposition about thought he'd go ahead and get out the warrant or whatever and he did but that was about a different burglary or theft[,] I don't see that that needs to come in, [defense counsel]. In other words, the warrant that he got – that he referred to in that deposition that c[a]me from a break-in six months before this happened.

-10-

[DEFENSE COUNSEL]: Well, Your Honor, again this refers specifically to the February incident that's the subject of this lawsuit.

[PROSECUTOR]: Judge, if you will look on the list of items taken that [defense counsel] introduced as his evidence, I think you will find a water heater. That refers to the August break-in. On February 28 when he was out at the house [defense counsel] asked him about those. He discovered that water heater and approximately one week later he went and took the warrant charging him with the August burglary here. It dealt with the August burglary and that's all it dealt with.

THE COURT: Well, I think if it goes back to the August burglary some six months before this we're concerned about, I don't think we need to get into that. These charges on this indictment came from February of 2000. When did he get out the warrant on that?

[PROSECUTOR]: Judge, he got that warrant out as soon as the property was discovered in May of 2000. He did not take this warrant until the property was discovered at the Johnson's as I recall and Ms. Hutchins – as I said I wasn't involved at that stage. She might correct me if I'm wrong but I believe it was after the property was discovered and it was Ms. Hutchins that took the warrant and it was on May 25 of 2000.

Thus, the trial court concluded that the victim had been referring to the August 1999 burglary rather than the February 2000 burglary, which is the basis for the present appeal. Although, as we have said, it appears from the trial transcript that the victim was present as the parties were arguing about whether, in his deposition responses, he was referring to the August or February burglary, he was not asked to clarify his deposition statement.

This court will not reverse the decision of a trial court to exclude evidence based on its lack of relevance unless the trial court has abused its discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997) (citations omitted). Abuse of discretion, in this context, essentially, contemplates a situation where the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)). Accordingly, "[a]lthough a decision made under this standard will not be lightly reversed on appeal, the discretion of the trial court is not without limits." State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000).

The specific determination made by the trial court, which we are reviewing, is that the victim, in recounting his cashing a check payable to the defendant, receiving a demand letter from counsel

for the defendant, repaying the amount of the check, and subsequently testifying at a deposition that he decided he "would go ahead and file charges against [the defendant] on what he'[d] done to me," referred to the August 1999 burglary "charges" against the defendant, and not the complaint regarding the February 2000 burglary for which he was being prosecuted. The trial court heard extensive testimony from the victim as to this matter, as well as argument of counsel. Since the deposition on which the defendant is relying is not in the record on appeal, we cannot attempt to determine the context in which this response was made by the victim. As a result, we cannot conclude that the trial court abused its discretion in determining that the victim, in his deposition statement, was referring to another incident, meaning that it was not relevant to the charges for which the defendant was being tried.

### III. Sufficiency of the Evidence

The defendant argues that "there is simply no evidence that establishes beyond a reasonable doubt that [the defendant] ever entered [the victim's] shop" and that "the State never introduced evidence of a key element of the crime."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted

defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A conviction based on circumstantial evidence is permitted in Tennessee. State v. Tharpe, 726 S.W.2d 896, 899 (Tenn. 1987). Whether the conviction is based upon direct or circumstantial evidence, the standard for appellate review is the same. State v. Johnson, 634 S.W.2d 670, 672 (Tenn. Crim. App. 1982). On appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). The weight given to circumstantial evidence is for the jury to determine. Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974). Circumstantial evidence alone may be sufficient to convict one of a crime, if such evidence sufficiently proves all the necessary elements. Tharpe, 726 S.W.2d at 899-900. In cases that hinge upon circumstantial evidence, it is well settled that the proof must be consistent with the guilt of the defendant and inconsistent with his innocence, and sufficiently strong to overcome every other reasonable hypothesis except that of guilt. Marie v. State, 204 Tenn. 197, 203-04, 319 S.W.2d 86, 89 (1958).

The defendant was convicted both of burglary and theft, the latter conviction not being included in his sufficiency argument. Tennessee Code Annotated section 39-14-402(a) defines burglary: "A person commits burglary who, without the effective consent of the property owner: (1) [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault[.]"

Taken in the light most favorable to the State, the proof in this matter was that Phillip Sandlin, who operated a business next to that of the victim, testified that, around 7:20 p.m. on February 24, 2000, he saw the defendant looking for parts for his truck behind the building. He told the defendant he would be at the business for a few more hours, when asked when he would be leaving. The next morning as he arrived at his business, he saw police officers at the victim's business. The victim testified that he had locked his business that evening and, the following morning, found that it had been broken into, and various items, including a heat gun, welder, paint scales, and paint gun, were missing. Detective Hutchins testified that entry had been made through a metal door. Ricky Johnson, Jr., testified that the defendant and Tittsworth brought the welder, identified by the victim as having been taken from his shop in the burglary, and asked Johnson to hold it for them. Tittsworth later told Johnson that the welder was "hot." Later, Ricky Johnson, Sr., saw the welder at his son's property and recognized it as belonging to the victim. The State argues that the evidence establishes circumstantially that the defendant burglarized the victim's shop.

We agree with the State that the evidence of the defendant's burglarizing the victim's shop, although circumstantial, was sufficient for the jury to reasonably determine that the defendant had committed the crimes, and, thus, the evidence is sufficient to support his convictions for burglary and theft.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE